USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: AUG 0 9 2018

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DISNEY ENTERPRISES, INC.,　　　　　　 :
MARVEL CHARACTERS, INC.,　　　　　　 :
LUCASFILM LTD. LLC, and LUCASFILM　 :
ENTERTAINMENT COMPANY LTD. LLC,　 :
　　　　　　　　　　　　　　　　　　 :
　　　　　　　　　Plaintiffs,　　　　 :
　　　　　　　　　　　　　　　　　　 :
　　　　-against-　　　　　　　　　　 :
　　　　　　　　　　　　　　　　　　 :
NICK SARELLI, a/k/a Avi Lieberman, and　 :
CHARACTERS FOR HIRE, LLC,　　　　　 :
　　　　　　　　　　　　　　　　　　 :
　　　　　　　　　Defendants.　　　　 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MEMORANDUM DECISION
AND ORDER

16 Civ. 2340 (GBD)

GEORGE B. DANIELS, United States District Judge:

Plaintiffs Disney Enterprises, Inc. ("Disney"), Marvel Characters, Inc. ("Marvel"), LucasFilm Ltd. LLC, and LucasFilm Entertainment Company Ltd. LLC (together with LucasFilm Ltd. LLC, "LucasFilm") bring this copyright and trademark infringement action against Defendant Characters for Hire, LLC ("CFH") and its principal, Defendant Nick Sarelli. (*See* 2d Am. Compl. ("SAC"), ECF No. 51.) Plaintiffs assert multiple claims against Defendants under federal and New York common law, principally alleging that Defendants infringed on Plaintiffs' intellectual property rights by marketing and operating a party services and entertainment business that uses Plaintiffs' copyrighted works and trademarks without authorization. (SAC ¶¶ 1, 33–37, 39–42, 44–47, 49–52, 54–57, 59–64.)

Plaintiffs move pursuant to Rule 56 of the Federal Rules of Civil Procedure seeking partial summary judgment with respect to their federal claims for copyright and trademark infringement, as well as their claim for trademark dilution under Section 360-l of New York's General Business Law. (*See* Pls.' Mot. for Summ. J. ("Pls.' Mot."), ECF No. 59, at 1; Pls.' Mem. in Supp. of Mot. for Summ. J. ("Pls.' Mem. in Supp."), ECF No. 60, at 13 n.4.) In addition, Plaintiffs seek summary judgment on the issue of willfulness. (*See* Pls.' Mot. at 1.) Defendants also move under Rule 56, seeking summary

judgment dismissing all claims asserted in the SAC.  (*See* Defs.' Mot. for Summ. J. ("Defs.' Mot."), ECF No. 66, at 1.)  They argue, among other things, that Plaintiffs' alleged copyrighted works are based on prior works that are part of the public domain and that their use of Plaintiffs' trademarks is protected by the nominative fair use defense.  (*See* Defs.' Mem. in Supp. of Summ. J. ("Defs.' Mem."), ECF No. 67, at 5–6, 7–9.)

Defendants' motion for summary judgment dismissing Plaintiffs' claims for (i) trademark infringement, (ii) unfair competition, and (iii) false designation of origin is GRANTED.  However, Defendants' motion for summary judgment dismissing Plaintiffs' claims for (i) trademark dilution, and (ii) copyright infringement is DENIED.  Plaintiffs' motion for partial summary judgment on its claims of (i) trademark infringement, (ii) copyright infringement, and (iii) trademark dilution is similarly DENIED.

## I.   FACTUAL BACKGROUND[1]

### A.  The Parties

Plaintiffs are large, related entertainment companies responsible for creating and bringing to life popular characters through comic books, animated series, motion picture films, video games, and theme parks.  (Pls.' 56.1 Stmt, ECF No. 61, ¶ 1.)  Plaintiffs claim intellectual property rights with respect to these characters, as well as their brands, titles, and properties, and those of its affiliates.  (*Id.* ¶ 4.)  Disney claims that it is the owner of federally-registered trademarks and copyrights in the "Mickey Mouse" and "Minnie Mouse" characters, among others, as well as the "Elsa" and "Anna" characters featured in the Disney motion picture film "Frozen."[2]  (*Id.* ¶¶ 18–25, 41–47.) Marvel claims

---

[1] The following facts and allegations are undisputed, unless otherwise indicated.

[2] Defendants move, pursuant to Rule 37 of the Federal Rules of Civil Procedure, to preclude certain documents purportedly proving Plaintiffs' ownership of several of the trademark and copyright registrations at issue in this case. (*See* Defs.' Mot. to Preclude, ECF No. 92.)  Defendants argue that the documents should be precluded because Plaintiffs failed to produce them during discovery.  (Defs.' Mem. in Supp. of Mot. to Preclude, ECF No. 94, at 6–7.)  It is undisputed, however, that either the documents themselves, or at least the relevant facts

ownership of federally-registered trademarks and copyrights in the "Avengers" characters, including "Captain America," "Hulk," and "Iron Man." (*Id.* ¶¶ 26–32, 48–56.) LucasFilm claims that it owns federally-registered trademarks and copyrights in several characters featured in the "Star Wars" motion picture films, including the "Stormtrooper," "Darth Vader," "Darth Maul," "Chewbacca," "Luke Skywalker," "Princess Leia," "Han Solo," "Obi-Wan Kenobi," and "Yoda" characters.[3] (*Id.* ¶¶ 33–40, 57–62.) Although Plaintiffs and their affiliates engage in licensed merchandising of their intellectual property, they maintain quality and other controls over authorized uses of those rights. (*Id.* ¶¶ 4, 9.) Such authorized uses include live appearances and meet-and-greet opportunities with Plaintiffs' characters at theme parks located in Florida and California, among other places. (*Id.* ¶ 10.)

Defendant CFH is in the business of advertising, promoting, producing, and selling themed entertainment party services for private parties and corporate events. (*Id.* ¶ 12; Defs.' 56.1 Stmt, ECF No. 71, ¶ 2.) Defendant Nick Sarelli, who uses the pseudonym "Avi Lieberman," is CFH's sole owner and managing director. (Pls.' 56.1 Stmt. ¶ 15.) As part of its business, CFH provides its customers

---

contained in those documents, are publicly available through the U.S. Patent and Trademark Office ("USPTO") or the U.S. Copyright Office ("USCO"). Accordingly, preclusion is not warranted. *See Bey v. City of New York*, No. 99 Civ. 3873 (LMM) (RLE), 2010 WL 3910231, at *4 (S.D.N.Y. Sept. 21, 2010) (denying Rule 37 motion where the challenged evidence was "publicly and equally available to all parties[,]" and collecting cases), *aff'd*, 454 F. App'x 1 (2d Cir. 2011). In any event, this Court is entitled to take judicial notice of Plaintiffs' ownership of the relevant trademarks and copyrights from the publicly filed certificates of registration and file wrappers. *See PaySys Int'l, Inc. v. Atos Se, Worldline SA, Atos IT Servs. Ltd.*, 226 F. Supp. 3d 206, 215 (S.D.N.Y. 2016) ("[A] certificate of registration from the United States Register of Copyrights constitutes prima facie evidence of the valid ownership of a copyright.") (citation omitted); *see also Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005) (taking notice of copyright registrations published in the USCO's copyright registry); *Goodman v. Universal Beauty Prod. Inc.*, No. 17 Civ. 1716 (KBF), 2018 WL 1274855, at *5 (S.D.N.Y. Mar. 9, 2018) (same); *Baja Ins. Servs., Inc. v. Shanze Enterprises, Inc.*, No. 14 Civ. 2423 (KJM) (AC), 2016 WL 1267999, at *1 (E.D. Cal. Mar. 31, 2016) (taking notice of file wrappers, and collecting cases).

[3] Plaintiffs have registered copyrights for model sheets, drawings, style guides, and motion picture films depicting the above-mentioned characters. (*See* Pls.' 56.1 Stmt. ¶¶ 41–62.)

with a wide variety of costumed characters for entertainment purposes.[4] (Defs.' 56.1 Stmt. ¶ 2.)   CFH promotes its business through its own website, as well as on several social media accounts. (*Id.* ¶ 3.)

### B. Alleged Infringing Conduct

Plaintiffs allege that CFH copied and used the images, likenesses, personas, and names of Plaintiffs' characters, as well as Plaintiffs' trademarks, to promote and advertise its services online. (Pls.' 56.1 Stmt. ¶¶ 13, 63.)  For instance, Plaintiffs claim that promotional videos on CFH's website and YouTube and Facebook pages depict costumed individuals portraying Disney's Mickey and Minnie Mouse characters. (*Id.* ¶¶ 64–66.)  Plaintiffs also claim that CFH advertised "Frozen Theme[d] Parties" on their website and social media sites, offering "Anna and Elsa [to] delight your children as they sing their favorite songs." (*Id.* ¶ 67; *see also* Decl. of Louis S. Ederer dated Oct. 13, 2017 ("Ederer Decl."), Ex. T, ECF No. 62-31, at DEI00009368–69.)  The advertisements contained videos and/or hyperlinks to videos of costumed actors portraying the Elsa and Anna characters singing songs from the Disney motion picture film Frozen. (Pls.' 56.1 Stmt. ¶¶ 68, 72; *see also* Ederer Decl., Ex. X at DEI00009367.)  One such advertisement included the caption "Delight your children as they watch the Frozen Snow Queen Elsa and her sister, Princess Anna[,] tell their story in this professional adaptation." (Pls.' 56.1 Stmt. ¶ 73.)   Another read, "Frozen themed kids party entertainment: Bring these professional musical theatre performers to your next kids [sic] birthday party as they retell the story of two sisters." (*Id.* ¶ 74.)  Plaintiffs claim that CFH posted photographs on its Facebook page of costumed actors dressed in full costume as the Elsa and Anna characters. (*Id.* ¶ 75.)

Plaintiffs claim that CFH's website also advertised "Avenging Team" themed parties, with images of several costumed actors portraying the Marvel franchise's Captain America, Hulk, and Iron

---

[4] Defendants claim that CFH purchases the character costumes at its customers' requests and only from authorized vendors selling legitimate merchandise. (Defs.' 56.1 Stmt. ¶¶ 2, 7–8.)  They further assert that the vendors from whom CFH purchases costumes have not indicated that there are restrictions limiting how the costumes may be used. (*Id.* ¶ 9.)

Man characters described as "The Soldier," "Man of Iron," and "Big Green Guy," respectively. (*Id.* ¶¶ 77–79.) One such advertisement offers "the most amazing premium entertainment" featuring "high flying action and incredible acrobatic stunts." (*Id.* ¶ 77.) Another notes that CFH's actors "are very authentic and remain in character throughout [the] event" and that "[s]ome of [CFH's] actors have even been trained by the actual Avengers stunt team." (*Id.* ¶ 79.)

CFH's website similarly advertised "Star Battles" events, with images of characters from the Star Wars motion picture series, as well as images of costumed actors portraying LucasFilm's characters such as Luke Skywalker ("Young Luke"), Darth Vader ("The Dark Lord"), Chewbacca ("Smugglers Co Pilot [sic]"), and Princess Leia ("The Princess"), and Obi-Wan Kenobi ("Old Ben"). (*Id.* ¶¶ 87–88; *see also* Ederer Decl., Ex. A, ECF No. 62-1, at 4.) In addition, CFH's website featured a video entitled "Star Wars Episode VII Themed Birthday Party," which portrayed various Star Wars characters dressed in full costume and CFH's "Special Effects, Robotics, and Lighting" design services. (Pls.' 56.1 Stmt. ¶ 89.) CFH also posted promotional videos on its Yelp, YouTube, Facebook, and Instagram webpages featuring actors depicting various Marvel and LucasFilm characters.[5] (*Id.* ¶¶ 80–86, 90–96.)

Plaintiffs assert that Defendants infringed their trademarks and copyrights not only with respect to CFH's advertising and marketing materials, but also by providing customers with the live costumed actors portraying Plaintiffs' copyrighted and trademarked characters. (*Id.* ¶¶ 101–210.) To support this claim, Plaintiffs point to several dozen, largely unsigned CFH event contracts offering various

---

[5] Defendants claim that CFH's advertising and promotional materials do not state that CFH is associated with, or otherwise sponsored, endorsed, or licensed by Plaintiffs. (Defs.' 56.1 Stmt. ¶ 4.) Defendants also dispute the accuracy of some of the images of CFH's website submitted in Plaintiffs' motion papers. (*See* Defs.' Resp. to Pls.' 56.1 Stmt., ECF No. 80, ¶ 67; *see also* Decl. of Nicholas Sarelli dated Nov. 10, 2017 ("Sarelli Decl."), ECF No. 82, ¶ 7.)

"party packages."[6]  (*See* Ederer Decl., Exs. N–P.[7])  One such contract purports to book an event at which CFH was to provide the "Captain America, Iron Man, [and] Hulk" characters, among others, who would perform an "Avengers Stage Combat Stunt Show" and run an "Avengers Camp." (*Id.*, Ex. O at CFH000194.) Another contract requires CFH to provide the "Darth Vader" and "Luke Skywalker" characters for a "Meet and Greet Plus" party, with CFH providing "Jedi Training, [an] Interactive Stage Show, [and] Darth Vader Combat" services.  (*Id.*, Ex. P at CFH000188.)   A different event contract had CFH providing the "Captain America" and "Iron man [sic]" characters for an "Interactive Theatrical Performance," (*id.*, Ex. O at CFH000198), while another purports to book an event with CFH providing the "Princess Anna" and "Snow Queen" characters for a "Meet and Greet with 3 songs." (*Id.*, Ex. N at CFH000232.)

Plaintiffs' claim that evidence of Defendants' bad faith and willful infringement can be inferred from the standard form language in CFH's event contracts.  They cite, for example, language added to CFH's contracts in or about November 2013 stating that, "[f]or copyright reasons, costumes may vary from design, pattern & color & will not be the same exact costume seen on the internet, movies[,] or other media format [sic]." (Pls.' 56.1 Stmt. ¶ 218 (quoting Ederer Decl., Ex. O at CFH000206).)  In or about March 2014, the contracts were amended to add, "CFH does not and will not use trademarked or licensed characters."  (Pls.' 56.1 Stmt. ¶ 219 (quoting Ederer Decl., Ex. P at CFH000215).)  CFH amended the form language in their event contracts yet again in or about January 2015 to state the following:

---

[6] Defendants object to the admissibility of the event contracts, arguing they have not been properly authenticated. (*See* Defs.' Resp. to Pls.' 56.1 Stmt. ¶¶ 101–210.)

[7] Because these documents contain confidential information pertaining to CFH's customers, they have been filed under seal pursuant to a stipulated protective order.  (*See* Protective Order dated Feb. 21, 2017, ECF No. 47.)

> Client understands that costumed characters are generic/inspired and are NOT affiliated, licensed or associated with any copyright or trademark. It is not our intention to violate any copyright laws. The characters that we offer are NOT name brand copyrighted characters, and Characters for Hire, LLC costumed characters are named of our own creation. Any resemblance to nationally known copyrighted characters is strictly coincidental. We DO NOT offer nor do we present any licensed and/or copyrighted characters.[8]

(Pls.' 56.1 Stmt. ¶ 220 (quoting Ederer Decl., Ex. P at CFH000258).)

Notwithstanding these disclaimers, Plaintiffs claim that CFH's customers remained confused as to whether the services CFH offers are sponsored, endorsed, or otherwise affiliated with Disney, Marvel, and/or LucasFilms. For instance, Plaintiffs point to customer reviews posted on CFH's website that reference Plaintiffs' characters by their real, trademarked names rather than the fake, generic ones used by CFH. (*See* Pls.' 56.1 Stmt. ¶¶ 224–29.) Plaintiffs' claim that this confusion is detrimental to their brands because of CFH's allegedly poor reputation. They note, for example, that three customer complaints have been filed with the Better Business Bureau ("BBB") against CFH since 2014, resulting in the BBB giving CFH an "F" rating. (*Id.* ¶ 231.) In addition, Plaintiffs claim, CFH has at least seventeen unfavorable reviews on its Yelp webpage commenting on Defendants' allegedly rude and unprofessional treatment of its customers.[9] (*Id.* ¶¶ 232–39.)

## C. Plaintiffs' Cease-and-Desist Letters

On November 24, 2015, Plaintiffs mailed Defendants a cease-and-desist letter. (*Id.* ¶ 212; *see also* Ederer Decl., Ex. F-1, ECF No. 61-7, at 3.) The letter, addressed to Sarelli, advised that CFH was "engaged in selling and offering for sale live party entertainment services featuring . . . . character impersonations as well as themed movie and television . . . characters that reproduce" Plaintiffs'

---

[8] In or about June 2015, the amended language was incorporated into a separate section of CFH's event contracts, entitled "Policy on Trademarked Characters." (*See, e.g.*, Ederer Decl., Ex. P at CFH000262).) Similar language was also added as a disclaimer on the "About Us" section of CFH's website. (*See id.*, Ex. Y, ECF No. 62-36, at DEI00009311.)

[9] All of the comments on CFH's own website that are cited by Plaintiffs, however, appear to reflect positively on Defendants' services and reputation. (*See* Pls.' 56.1 Stmt. ¶¶ 224–29.)

intellectual property. (Ederer Decl., Ex. F-1 at 4.) Accordingly, Plaintiffs demanded that CFH "immediately cease and desist all sale, advertising, marketing, promotion[,] and/or provision" of the infringing services, as well as remove any infringing marketing materials from its website and other online platforms. (*Id.* at 4–5.)

Plaintiffs' letter attached various printouts from CFH's website containing the allegedly infringing images and videos and asked for a response from Defendants within seven days. (*See id.* at 5–16; Ederer Decl., Ex. F-2, ECF No. 61-8, at 1–16; Ederer Decl., Ex. F-3, ECF No. 61-9, at 1–16.) When no response came, Plaintiffs sent Defendants a second cease-and-desist letter on December 9, 2015. (Pls.' 56.1 Stmt. ¶ 213; Ederer Decl., Ex. G-1, ECF No. 61-10, at 3.) Plaintiffs advised that if they did not receive a response within five days, they would take further action, including filing a lawsuit in federal court to enforce their intellectual property rights. (Ederer Decl., Ex. G-1 at 3.)

On December 10, 2015, Plaintiffs' counsel received an email signed by "Avi Lieberman," indicating that "all images . . . pertaining to" Plaintiffs' intellectual property were removed from CFH's website. (Pls.' 56.1 Stmt. ¶ 214; Ederer Decl., Ex. H, ECF No. 61-14, at 3.) The email further stated that CFH did not "inten[d] to disregard [Plaintiffs'] intellectual property rights . . . and meant no harm in doing so." (Ederer Decl., Ex H, at 3.) However, on January 28, 2016, Plaintiffs sent a third cease-and-desist letter stating that not all infringing materials were removed from CFH's website and demanding that Defendants completely disable access to the website accordingly. (*See* Ederer Decl., Ex. I-1, ECF No. 62-15, at 3–4.) When Defendants failed to do so, Plaintiffs filed this action, asserting claims against Defendants under federal and New York law for trademark infringement and copyright infringement, unfair competition and false designation of origin, and trademark dilution.[10] (*See* SAC ¶¶ 33–37, 39–42, 44–47, 49–52, 54–57, 59–64.)

---

[10] Defendants maintain that CFH made every effort in good faith to find and remove from its website any infringing videos or images identified by Plaintiffs. (*See* Sarelli Decl. ¶ 9.)

Plaintiffs now seek summary judgment on their federal trademark and copyright infringement claims, as well as their claim under New York law for trademark dilution. (Pls.' Mot. at 1.) In addition, Plaintiffs seek summary judgment on the issue of willfulness. (*Id.*) Defendants also move for summary judgment, seeking to have the entire lawsuit dismissed. (Defs.' Mot. at 1.)

## II.  LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when "it 'might affect the outcome of the suit under the governing law.'" *Gayle*, 313 F.3d at 682 (quoting *Anderson*, 477 U.S. at 248).

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002). In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. To do so, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)), and it "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). Rather, the non-moving party must produce admissible evidence that supports its pleadings. *See First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289–90 (1968). In this regard, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (quoting *Anderson*, 477 U.S. at 252).

In determining whether a genuine issue of material fact exists, the court must "construe[] the evidence in the light most favorable to the non-moving party" and "draw[] all inferences in [that party's] favor. *See Niagara*, 315 F.3d at 175. The court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Summary judgment is therefore "improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel*, 310 F.3d at 286.

### III.   PLAINTIFFS' CLAIMS

Plaintiffs' SAC asserts federal claims for trademark infringement, copyright infringement, and unfair competition and false designation of origin. Plaintiffs' also assert claims under New York law for trademark infringement, unfair competition, and trademark dilution. Although Plaintiffs seek summary judgment on only some of its claims, Defendants seek summary judgment with respect to all claims asserted in the SAC. Accordingly, this Court addresses each of Plaintiffs' claims as alleged.

### A.   Trademark Infringement, Unfair Competition and False Designation of Origin

Plaintiffs' federal trademark infringement claims arise under Section 32 of the Lanham Act.[11] (*See* SAC ¶¶ 39–42.) Under Section 32, "the owner of a mark registered with the Patent and Trademark Office can bring a civil action against a person alleged to have used the mark without the owner's consent." *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 146 (2d Cir. 2007). To prevail on a claim for trademark infringement under the Lanham Act, a plaintiff must show that (1) the "mark is entitled to protection," and (2) "the defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods." *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 102 (2d

---

[11] Section 32 of the Lanham Act provides, in pertinent part, that "[a]ny person who shall, without the consent of the registrant . . . use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant." 15 U.S.C. § 1114.

Cir. 2010); *see also Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d

153, 161 (2d Cir. 2016) ("[T]he modern test of infringement is whether the defendant's use [is] likely

to cause confusion *not just as to source*, but also as to sponsorship, affiliation or connection.") (citation

omitted), *cert. denied*, 137 S. Ct. 624 (2017).

Where the marks in question are registered, as here, their entitlement to protection is presumed.

*See Slep-Tone Entm't Corp. v. Golf 600 Inc.*, 193 F. Supp. 3d 292, 297 (S.D.N.Y. 2016); *see also*

*Patsy's Italian Rest., Inc. v. Banas*, 658 F.3d 254, 266 (2d Cir. 2011) ("[R]egistration of a federal mark

confers upon the owner of the mark a presumption that the owner has the exclusive right to use the

mark nationwide.") (citing 15 U.S.C. § 1115(a)). To determine whether a defendant's use of the mark

is likely to cause consumer confusion, courts apply the non-exclusive, eight-factor balancing test set

forth in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961). *See Int'l Info. Sys.*, 823

F.3d at 160. Those factors include:

> (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the
> products and their competitiveness with one another; (4) evidence that the senior
> user may "bridge the gap" by developing a product for sale in the market of the
> alleged infringer's product; (5) evidence of actual consumer confusion; (6)
> evidence that the imitative mark was adopted in bad faith; (7) respective quality
> of the products; and (8) sophistication of consumers in the relevant market.

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009) (citation omitted).

"The application of the *Polaroid* test is not mechanical, but rather, focuses on the ultimate question of

whether, looking at the products in their totality, consumers are likely to be confused." *Int'l Info. Sys.*,

823 F.3d at 160 (quoting *Kelly-Brown v. Winfrey*, 717 F.3d 295, 307 (2d Cir. 2013). The same

standards govern claims for unfair competition and false designation of origin under the Lanham Act,

as well as trademark infringement and unfair competition under New York law. *See Tiffany*, 600 F.3d

at 101 n.6; *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 649 (S.D.N.Y.

2016), *aff'd sub nom. LVL XIII Brands, Inc. v. Louis Vuitton Malletier SA*, 720 F. App'x 24 (2d Cir.

2017); *Pulse Creations, Inc. v. Vesture Grp., Inc.*, 154 F. Supp. 3d 48, 54 (S.D.N.Y. 2015); *Van Praagh v. Gratton*, 993 F. Supp. 2d 293, 301 (E.D.N.Y. 2014).

Plaintiffs assert that CFH's use of Plaintiffs' marks to advertise and promote its business, as well as its provision of live costumed actors pretending to be Plaintiffs' characters, are likely to cause consumer confusion as to the origin, source, and/or sponsorship of CFH's unlicensed services. (Pls.' Mem. in Supp. at 6, 13–16.)  Defendants, however, contend that there is no likelihood of consumer confusion and that their use of Plaintiffs' marks is a non-infringing, fair use under Section 33(b) of the Lanham Act insofar as they only use Plaintiffs' marks to describe the goods and services they offer their customers.  (*See* Defs.' Mem. at 6–8; Defs.' Mem. in Opp'n to Pls.' Mot. for Summ. J. ("Defs.' Opp'n"), ECF No. 85, at 9–10, 13–14.)  Defendants also argue that their use of Plaintiffs' marks is protected by the doctrine of nominative fair use, which they claim permits them to use the names of Plaintiffs' characters to identify the services CFH provides.  (Defs.' Mem. at 8–9; Defs.' Opp'n at 11–13.)

Neither of Defendants' fair use defenses have merit.

### 1.  Descriptive Fair Use

Section 33(b) of the Lanham Act provides an affirmative defense to a claim of trademark infringement where "the use of the name[] . . . charged to be an infringement is a use, otherwise than as a mark, . . . which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin."  15 U.S.C. § 1115(b)(4).  Thus, to prevail on such a defense, the defendant must prove three elements: "that the use was made (1) other than as a mark, (2) in a descriptive sense, and (3) in good faith."  *Kelly-Brown*, 717 F.3d at 308 (citations omitted).  The purpose of the fair use defense is to "permit[] others to use a protected mark to describe *aspects* of their own goods."  *Merck & Co. v. Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d 402, 412 (S.D.N.Y.

2006) (emphasis added) (quoting *Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 73 (2d Cir. 1999)).

Here, CFH's promotional materials do not use Plaintiffs' marks like "Frozen," the "Avengers," or "Star Wars," in a descriptive sense at all.  To be sure, the use of a mark can be "descriptive" without actually describing physical characteristics of the good.  *See Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 30 (2d Cir. 1997) (the phrase "Seal it with a Kiss" was used in a descriptive sense when it appeared in a lipstick advertisement because it "describe[d] an action that the sellers hope[d] consumers [would] take, using their product"); *Car-Freshner Corp. v. S.C. Johnson & Son, Inc.*, 70 F.3d 267, 270 (2d Cir. 1995) (pine-tree shape of defendant's product was fair use because "the use of the pine-tree shape refers to the Christmas season," during which the allegedly infringing product was sold); *B & L Sales Assocs. v. H. Daroff & Sons, Inc.*, 421 F.2d 352, 354 (2d Cir. 1970) (the phrase "Come on Strong" was used in a descriptive sense when it appeared in an advertisement for men's clothing because it "describ[ed] a presumably desirable effect" of the clothing).  In this case, however, Defendants' advertising efforts were specifically designed to evoke in consumers' minds *Plaintiffs'* renowned marks and characters in an effort to trade on their popularity and goodwill.

Defendants argue incorrectly that this case is on all fours with *Naked Cowboy v. CBS*, 844 F. Supp. 2d 510 (S.D.N.Y. 2012).  (Defs.' Mem. at 7–8.)  There, a street performer known as "The Naked Cowboy," who plays the guitar dressed only in his briefs, cowboy boots, and a cowboy hat, brought suit for trademark infringement against defendant CBS after it posted a video on its YouTube channel titled "The Bold and the Beautiful—Naked Cowboy."  *Naked Cowboy*, 844 F. Supp. 2d at 513–14.  The video was taken from an episode of the daytime television series "The Bold and the Beautiful," which featured a character who, for several seconds, appeared only in his briefs, cowboy boots, and a cowboy hat, while singing and playing the guitar.  *Id.* at 513.  The court held, however, that the

13

reference to the "Naked Cowboy" in the video's title was a non-infringing fair use under Section 33(b)(4) of the Lanham Act because the defendant "used the phrase in an effort to describe the contents of the video clip, not as a mark to identify the source of the video clips." *Id.* at 515. As the court noted, "[t]he fair use defense permits use of protected marks in descriptive ways, but not as marks identifying the user's own product." *Id.* (citing *Car-Freshner Corp.*, 70 F.3d at 270). Here, by contrast, Defendants do not use Plaintiffs' marks to describe aspects or features of their services, but rather to identify their service offerings.

Moreover, whereas a reasonable consumer could view the video in *Naked Cowboy* and understand the clip to be depicting a nearly naked man pretending to be a cowboy—independent of the street performer known as The Naked Cowboy—a reasonable consumer viewing CFH's advertisements offering, for example, a "Frozen Themed Party" would understand the nature of the services being offered only by reference to Plaintiffs' marks. *See Car-Freshner Corp.*, 70 F.3d at 269 ("What matters [for purposes of the fair use defense] is whether the defendant is using the protected word or image descriptively, and *not as a mark*.") (emphasis added). Thus, Defendants have failed to meet their burden of demonstrating, under Section 33(b) of the Lanham Act, that CFH uses Plaintiffs' marks in a "descriptive sense."[12] *Id.*

### 2. *Nominative Fair Use*

"[N]ominative fair use occurs when [a] plaintiff's mark is used to describe [the] plaintiff's own product." *Jackson v. Odenat*, 9 F. Supp. 3d 342, 360 (S.D.N.Y. 2014) (citing *Cairns v. Franklin Mint*

---

[12] Defendants' fair use defense also fails because CFH's advertisements across multiple platforms consistently used Plaintiffs' recognizable marks *as marks* "to attract public attention." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 400 (2d Cir. 2009) (internal quotation marks and citation omitted); 2 McCarthy on Trademarks and Unfair Competition § 11:46 (5th ed.) ("Often, an infringing trademark usage of the challenged term is evidenced by its employment as an attention-getting symbol.") (internal quotation marks and citations omitted); *see also Kelly-Brown*, 717 F.3d at 310 (rejecting fair use defense where "defendants . . . tr[ied] to create, through repetition across various forms of media, a similar association between" the plaintiff's mark and the defendants' products).

*Co.*, 292 F.3d 1139, 1151 (9th Cir. 2002)).   As the Second Circuit has observed, "[i]t is called 'nominative' use because it 'names' the real owner of the mark." *Int'l Info. Sys.*, 823 F.3d at 165 (internal quotation marks and citation omitted).   Under the doctrine of nominative fair use, a defendant is permitted to "use a plaintiff's trademark where doing so is necessary to describe the plaintiff's product and does not imply a false affiliation or endorsement by the plaintiff of the defendant." *Tiffany*, 600 F.3d at 102–03 (internal quotation marks and citation omitted).

Plaintiffs argue persuasively that the nominative fair use defense is inapposite to facts presented here.   Among other things, Plaintiffs point out that Defendants use Plaintiffs' marks to identify *Defendants'* character-for-hire services, rather than any of Plaintiffs' goods or services.   (Pls.' Mem. in Opp'n to Mot. for Summ. J., ECF No. 77, at 19–20; Pls.' Reply, ECF No. 87, at 6.)   Yet, as the Second Circuit has explained, the nominative fair use defense exists to protect the "use of another's trademark to identify, not the *defendant's* goods or services, but the *plaintiff's* goods or services." *Int'l Info. Sys.*, 823 F.3d at 165 (emphases added) (internal quotation marks and citations omitted). Accordingly, Defendants' reliance on the nominative fair use defense is misplaced.[13]

### 3.   *Likelihood of Consumer Confusion*

The touchstone of a meritorious trademark infringement claim is likelihood of consumer confusion. *Kelly-Brown*, 717 F.3d at 307 (citations omitted).   As noted, courts in this Circuit assess the likelihood of consumer confusion by balancing the *Polaroid* factors. *Id.*   Indeed, "it is incumbent upon the district judge to engage in a deliberate review of each factor, and, if a factor is inapplicable to a case, to explain why." *Nat. Organics, Inc. v. Nutraceutical Corp.*, 426 F.3d 576, 579 (2d Cir. 2005)

---

[13] *Tiffany*, upon which Defendants rely, (Defs.' Mem. at 8–9; Defs.' Opp'n at 11–12), is not to the contrary. There, the court held it was fair use for the defendant, eBay, to use Tiffany's mark to describe genuine Tiffany goods offered for sale on its e-commerce website because "none of eBay's uses of the mark suggested that Tiffany affiliated itself with eBay or endorsed the sale of its products through eBay's website." *Tiffany*, 600 F.3d at 103. Here, by contrast, Defendants use Plaintiffs' marks to identify or describe their own character-for-hire services, and not any good or service offered by Plaintiffs.

(internal quotation marks and citation omitted). However, that one or more factors may weigh in one party's favor does not preclude summary judgment in the other's favor with respect to likelihood of confusion. *See LVL XIII Brands*, 209 F. Supp. 3d at 687–88; *Advance Magazine Publishers, Inc. v. Norris*, 627 F. Supp. 2d 103, 113 (S.D.N.Y. 2008); *O'Keefe v. Ogilvy & Mather Worldwide, Inc.*, 590 F. Supp. 2d 500, 526 (S.D.N.Y. 2008).

An application of the *Polaroid* factors to the present facts readily demonstrates that Plaintiffs have not shown a likelihood of consumer confusion as to the origin, source, and/or sponsorship of Defendants' character-for-hire services.

a. Strength of Plaintiffs' Marks

"[T]he strength of a mark depends ultimately on its distinctiveness, or its 'origin-indicating' quality, in the eyes of the purchasing public." *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 457 (2d Cir. 2004) (citation omitted). Courts considering this factor typically "look[] at the mark's tendency to identify the goods or services sold under the mark as emanating from a particular[] . . . source." *Mr. Water Heater Enters., Inc. v. 1-800-Hot Water Heater, LLC*, 648 F. Supp. 2d 576, 584 (S.D.N.Y. 2009) (internal quotation marks and citation omitted). In addition, courts consider "both the mark's inherent distinctiveness, based on the characteristics of the mark itself, and its acquired distinctiveness, based on associations the mark has gained through use in commerce." *Akiro LLC v. House of Cheatham, Inc.*, 946 F. Supp. 2d 324, 333 (S.D.N.Y. 2013); *see also TCPIP Holding Co. v. Haar Commc'ns Inc.*, 244 F.3d 88, 100 (2d Cir. 2001) (discussing the concepts of inherent and acquired distinctiveness).

Plaintiffs claim that their marks "are some of the most recognizable . . . in the world of entertainment." (Pls.' Mem. in Supp. at 15.) Defendants do not contest this point, nor could they given the ubiquity of Plaintiffs' well-known and highly popularized marks. Accordingly, the first *Polaroid* factor weighs in Plaintiffs' favor.

b.  Similarity of the Marks

"When comparing two marks, courts consider their 'overall impression,' including 'the context in which they are found and the totality of factors that could cause confusion among prospective purchasers.'" *Advance Magazine*, 627 F. Supp. 2d at 117 (quoting *Gruner + Jahr USA Pub., a Div. of Gruner + Jahr Printing & Pub. Co. v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir. 1993); *see also Akiro*, 946 F. Supp. 2d at 334 ("Similarity is a holistic consideration that turns on the marks' sight, sound, and overall commercial impression under the totality of the circumstances."). Thus, "[i]nstead of merely conducting a side by side comparison [of the marks], a court must assess whether a customer who is somewhat familiar with the plaintiff's mark would likely be confused when presented with the defendant's mark alone." *Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 446 (S.D.N.Y. 2017) (internal quotation marks and citations omitted).

Plaintiffs argue this factor weighs in their favor because the costumed characters that CFH advertises and supplies its customers "are either identical or virtually identical to Plaintiffs' characters in image, costume, name, and/or total 'look and feel[.]'" (Pls.' Mem. in Supp. at 15 (citation omitted).) Defendants do not contest this point, and their fair use arguments concede the use of Plaintiffs' exact marks to identify Defendants' services. This factor thus appears to favor Plaintiffs. *See Audi AG v. Shokan Coachworks, Inc.*, 592 F. Supp. 2d 246, 273 (N.D.N.Y. 2008) ("Where marks are 'essentially identical[,]' the second factor of the *Polaroid* analysis weighs in favor of the plaintiff.") (quoting *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 873 (2d Cir. 1986)).

On the other hand, however, few, if any, of Plaintiffs' marks are used in CFH's advertisements in their original fonts, styles, and colors. *See MetLife, Inc. v. Metro. Nat'l Bank*, 388 F. Supp. 2d 223, 230 (S.D.N.Y. 2005) ("Typefaces are relevant considerations when evaluating marks' similarities."); *LaPine v. Seinfeld*, No. 08 Civ. 128 (LTS) (RLE), 2009 WL 2902584, at *14 (S.D.N.Y. Sept. 10, 2009) ("The difference in overall colors, cover layout, patterns[,] and font [may] reduce[] any similarity of

17

the appearance of the marks."), *aff'd*, 375 F. App'x 81 (2d Cir. 2010).  Moreover, many of the costumed

characters Defendants offer are identified on CFH's website using facetious names that are clearly

distinct from Plaintiffs' marks.  (*See, e.g.*, Ederer Decl., Ex. A at 3–4 (offering characters such as "Big

Green Guy," "The Soldier," "Beauty," "Indian Princess," "The Dark Lord," and "Smugglers Co Pilot

[sic]").  Therefore, the totality of circumstances surrounding CFH's advertisements and the type of

services it offers customers are not likely to suggest to the ordinary, reasonable consumer any affiliation

with, or sponsorship by, Plaintiffs.  Accordingly, the second *Polaroid* factor weighs only slightly, if at

all, in Plaintiffs' favor.

> c.  Competitive Proximity and Bridging the Gap

The third and fourth *Polaroid* factors, respectively, address the proximity of the goods or

services at issue and the possibility that the senior user will "bridge the gap," or expand the scope of

its business and enter the market of the junior user. *See Akiro*, 946 F. Supp. 2d at 335; *U.S. Polo Ass'n,*

*Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 531 (S.D.N.Y. 2011), *aff'd*, 511 F. App'x 81 (2d

Cir. 2013).  Thus, these two distinct but related factors "focus on the degree to which the [parties']

products currently compete with each other or are likely to compete with each other in the future."

*Medici Classics Prods., LLC v. Medici Grp., LLC*, 683 F. Supp. 2d 304, 311–12 (S.D.N.Y. 2010).

Courts analyzing these factors take into account "whether and to what extent the [parties']

products compete with each other[,]" as well as "the nature of the products themselves and the structure

of the relevant market." *Joules Ltd. v. Macy's Merch. Grp., Inc.*, 695 F. App'x 633, 636 (2d Cir. 2017)

(internal quotation marks and citations omitted).  "The purpose of the inquiry, which considers both

market proximity and geographic proximity, is 'to determine whether the two products have an

overlapping client base that creates a potential for confusion.'"  *Classic Liquor Imps., Ltd. v. Spirits*

*Int'l B.V.*, 201 F. Supp. 3d 428, 447 (S.D.N.Y. 2016) (quoting *Brennan's, Inc. v. Brennan's Rest.,*

*L.L.C.*, 360 F.3d 125, 134 (2d Cir. 2004)); *see also Morningside Grp. Ltd. v. Morningside Capital Grp.,*

*L.L.C.*, 182 F.3d 133, 140 (2d Cir. 1999) ("When [the parties] provide essentially the same service to the same customer base, their services are related and proximate.") (internal quotation marks omitted).

Plaintiffs argue that the third and fourth *Polaroid* factors weigh in their favor because they present their fictional characters "in live form at Plaintiffs' themed amusement parks" and thus engage in the "exact same business" as CFH. (Pls.' Mem. in Supp. at 15.) Defendants, however, assert that unlike Plaintiffs, CFH markets and offers entertainment at private birthday parties and corporate events. (Defs.' Opp'n at 13.) In response, Plaintiffs argue that even if they do not actually provide live costumed characters at private parties, ordinary consumers, particularly children, would reasonable perceive that they could provide such services. (Pls.' Reply at 7.)

These factors both tip in Defendants' favor. Although Plaintiffs present their trademarked characters in costume at theme parks located in Florida and California, there is no evidence that they currently, or are likely to at any point in the future, compete with CFH by offering character-for-hire services for private entertainment purposes. Nor is there any evidence that Plaintiffs' theme parks and CFH's marketing and provision of character-for-hire services have an overlapping customer base sufficient to create a potential for confusion. For instance, it is plain that theme park guests are in a different market altogether from those looking to hire a costumed character to appear at a child's birthday party or a corporate event.

In addition, Plaintiffs cite no evidence to support their conclusory assertion that it is reasonable for ordinary customers to perceive that Plaintiffs could or are likely to expand their offerings into providing costumed character services at private events. Moreover, Plaintiffs offer no basis in fact, law, or logic to believe that the relevant market for CFH's party and entertainment services are children; adults, *not* children, plan parties. Indeed, CFH's advertisements exclusively target parents and other adults, not children. (*See, e.g.*, Ederer Decl., Ex. S-1, ECF No. 61-29, at DEI00009377 ("Bring the excitement of winter to your next Frozen themed event. Let Ana [sic] and Elsa delight your children

19

as they sing their favorite songs."); *id.*, Ex. D-1, ECF No. 61-4 at 4 ("Unleash these mighty heroes at your next kids [sic] birthday party or corporate event.").)

Accordingly, the third and fourth *Polaroid* factors weigh in Defendants' favor.

d.   Evidence of Actual Confusion

The fifth *Polaroid* factor asks courts to consider the evidence that consumers are actually confused as to the origin of a particular product or service or as to whether the junior user of a mark is sponsored by or affiliated with the senior user.  Although actual confusion need not be demonstrated to prevail on a claim for trademark infringement, *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 45 (2d Cir. 2016), "there can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion." *Flushing Bank v. Green Dot Corp.*, 138 F. Supp. 3d 561, 589 (S.D.N.Y. 2015); *see also Guthrie*, 826 F.3d at 44 ("Instances of actual confusion resulting from a junior user's use of a mark similar to a senior user's can be powerful evidence supporting a likelihood of confusion."); *Gross v. Bare Escentuals Beauty, Inc.*, 641 F. Supp. 2d 175, 187 (S.D.N.Y. 2008) ("[E]vidence of actual confusion is given particular weight" in the *Polaroid* analysis).

Such evidence "may consist of anecdotal or survey evidence." *LVL XIII Brands*, 209 F. Supp. 3d at 672 (internal quotation marks and citation omitted).  With respect to anecdotal evidence, a plaintiff must show "a probability of confusion . . . affecting *numerous* ordinary prudent purchasers." *O'Keefe*, 590 F. Supp. 2d at 523 (emphasis added) (internal quotation marks and citations omitted). Accordingly, "[d]e minimis evidence of actual confusion does not establish the existence of a genuine issue of material fact regarding the likelihood of confusion." *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 124 (2d Cir. 2001) (citation omitted).  Moreover, the anecdotal evidence of confusion "must be of a type that 'could inflict commercial injury on the plaintiff in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation.'" *LVL XIII Brands*, 209 F. Supp. 3d at 672 (quoting *Lang v. Ret. Living Pub. Co., Inc.*, 949 F.2d 576, 583 (2d Cir. 1991)).   In

addition, although statistical evidence is not strictly required, "the absence of surveys is evidence that actual confusion cannot be shown[.]" *The Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 964 (2d Cir. 1996); *see also O'Keefe*, 590 F. Supp. 2d at 523 ("[T]he lack of survey evidence counts against finding actual confusion.") (internal quotation marks and citations omitted).

Here, there is no evidence of actual consumer confusion. The only anecdotal "evidence" Plaintiffs can muster are a handful of instances where CFH's customers referred to the actual names of Plaintiffs' characters in online reviews rather than using the names provided for such characters on CFH's website.[14]   (*See* Pls.' Mem. in Supp. at 16 (citing Pls.' 56.1 Stmt. ¶¶ 233–30); Pls.' Reply at 7 & n.5.)   Yet, none of the customer reviews suggest the slightest sign of confusion as to the origin, source, affiliation, or sponsorship of CHF's services, much less confusion likely to produce "a diversion of sales, damage to goodwill, or loss of control over reputation." *LVL XIII Brands*, 209 F. Supp. 3d at 672 (internal quotation marks and citation omitted).   Plaintiffs also fail to offer statistical surveys showing any instances of consumer confusion despite CFH providing character-for-hire services using Plaintiffs' trademarked characters since at least 2012. (*See, e.g.*, Ederer Decl., Ex. O at CFH000115, CFH000121, CFH000124; *id.*, Ex. P at CFH000110–11.)   That Plaintiffs and Defendants have used similar marks over a substantial period of time without ever producing a single recorded instance of consumer confusion shows that there is no likelihood of consumer confusion. *See Guthrie*, 826 F.3d at 44.

Accordingly, this factor, too, weighs in Defendants' favor.

---

[14] One such review, for example, noted that the customer's son "was thrilled to battle Darth Vader" but "afraid to battle Darth Maul[.]" (Pls.' 56.1 Stmt. ¶ 226.)   Plaintiffs argue that this and similar reviews demonstrate actual customer confusion because "customers hire CFH to impersonate Plaintiffs' characters and convince children that they are interacting with their favorite characters . . . and that is what CFH's young customers believe." (Pls.' Reply at 7.)   However, given that CFH's customers are adults, rather than children, it is of little significance to the likelihood of consumer confusion analysis that children may mistake CFH's costumed actors for Plaintiffs' fictional characters.

e.  Defendant's Intent and Evidence of Bad Faith

The sixth *Polaroid* factor focuses on "whether the defendant adopted [the plaintiff's] mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Bath & Body Works Brand Mgmt., Inc. v. Summit Entm't, LLC*, 7 F. Supp. 3d 385, 397 (S.D.N.Y. 2014) (quoting *Lang*, 949 F.2d at 583). "Where there is 'no evidence that the defendant acted in bad faith . . . by deceiving customers into believing that its products were related to' the plaintiff, this factor favors defendant." *Malletier v. Dooney & Bourke, Inc.*, 561 F. Supp. 2d 368, 388 (S.D.N.Y. 2008) (quoting *N.Y. Stock Exch., Inc. v. New York, New York Hotel LLC*, 293 F.3d 550, 556 n.1 (2d Cir. 2002)).

As evidence of Defendants' bad faith, Plaintiffs' point to: (1) the disclaimer in CFH's event contracts that any similarity between their character costumes and Plaintiffs' characters is coincidental; (2) CFH's use of "slightly altered character names that nevertheless remain recognizable" as Plaintiffs' characters; (3) CFH's surreptitious removal of Plaintiffs' characters' names from its own customers' online reviews; (4) and Sarelli's false representation to Plaintiffs' counsel that CFH would cease its infringing activity in response to Plaintiffs' cease and desist letters. (Pls.' Mem. in Supp. at 16.) Plaintiffs also claim that Defendants' bad faith can be inferred from the fact that CFH knew of Plaintiffs' marks but nevertheless decided to copy them to further its business. (*Id.*)

Plaintiffs' claimed evidence of Defendants' bad faith misses the mark. CFH's event contract disclaimer, the use of "slightly altered character names" from those of Plaintiffs' characters, and edits of customer reviews are not evidence of bad faith at all. To the contrary, they are more likely to put customers on notice that CFH's services were *not* sponsored or affiliated by Plaintiffs, and if anything, signify efforts to *avoid* "deceiving customers into believing that its products were related to" Plaintiffs.' *Dooney & Bourke*, 561 F. Supp. 2d at 388. Defendants' failure to comply with Plaintiffs' cease and desist letters also cannot reasonably be interpreted as evidence of bad faith . *See O'Keefe*, 590 F. Supp.

2d at 525 ("If a defendant reasonably believes its mark does not infringe plaintiff's, she does not act with the requisite intention of capitalizing on plaintiff's reputation and goodwill.") (internal quotation marks and citation omitted); *Strange Music, Inc. v. Strange Music, Inc.*, 326 F. Supp. 2d 481, 494 (S.D.N.Y. 2004) ("Evidence of a failure to discontinue [after receiving a cease and desist letter] does not per se establish defendants' bad faith."). Nor can Defendants' mere prior knowledge of Plaintiffs' marks be used to infer an intent to "promote confusion between the products or appropriate [Plaintiffs'] good will." *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 575 (2d Cir. 1993); *see also Lang*, 949 F.2d at 584 (rejecting argument that prior knowledge of another's mark gives rise to an inference of bad faith).

Absent evidence that Defendants acted to deceive customers into believing their character-for-hire services were related to Plaintiffs, this factor also weighs in Defendants' favor.

      f.   Quality of Defendant's Products

The seventh *Polaroid* factor—the quality of the defendant's products—involves two concepts seemingly at odds with each other.  On the one hand, where "the quality of a junior user's product or service is low compared to the senior user, 'there is an increased chance of actual injury when there is confusion.'" *Flushing Bank*, 138 F. Supp. 3d at 591 (quoting *Savin*, 391 F.3d at 461).  On the other hand, "[a] marked difference in quality[] . . . actually tends to reduce the likelihood of confusion in the first instance, because buyers will be less likely to assume that the senior user whose product is high-quality will have produced the lesser-quality products of the junior user." *Savin*, 391 F.3d at 461.

Plaintiffs argue that this factor weighs in their favor because "CFH's substandard operations present a serious risk of devaluing or tarnishing Plaintiffs' reputation for providing high quality goods and services." (Pls.' Mem. in Supp. at 16.)  For example, they point to the three customer complaints lodged with the BBB and a number of "not currently recommended" reviews posted on CFH's Yelp webpage. (Pls.' 56.1 Stmt. ¶¶ 231–39.)  Yet, the evidence in the record demonstrates that CFH receives

many positive reviews for its services, as well. (*See id.* ¶¶ 224–29.) Moreover, *none* of the reviews cited in the record betray any sign of consumer confusion as to the source, sponsorship, or affiliation of CFH's products or services. Nor do they suggest that Plaintiffs' reputations are being tainted as a result of being confused with Defendants' allegedly inferior services. To the contrary, in light of Plaintiffs' well established and highly regarded reputations in the entertainment industry, (*see, e.g., id.* ¶¶ 5–8), if Defendants' services are in fact of a lesser quality, it is likely that ordinary consumers will assume Plaintiffs are not responsible for them.

Accordingly, this factor tips in Defendants' favor.

### g.  Consumer Sophistication

The final *Polaroid* factor considers the sophistication of the consumers purchasing the goods or services in question. Generally, "[t]he more sophisticated or discriminating the purchaser, the lower the likelihood of confusion[]" since "a discriminating purchaser will examine the product or service carefully, dispelling any initial questions as to the origin or association of the product." *Flushing Bank*, 138 F. Supp. 3d at 591–92 (internal citation omitted); *see also Savin*, 391 F.3d at 461 ("[T]he more sophisticated the purchaser, the less likely he or she will be confused by the presence of similar marks in the marketplace.").

Courts analyzing this factor typically "consider[] the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 390 (2d Cir. 2005) (internal quotation marks and citation omitted). As with actual confusion, "[c]onsumer sophistication may be proved by direct evidence such as expert opinions or surveys." *Id.* In some cases, however, courts may "reach a conclusion about consumer sophistication based solely on the nature of the product or its price." *Id.*; *see, e.g., Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 219 (2d Cir. 2003) (noting that consumer sophistication is generally low in dealing with

24

cheaper products sold in the supermarket); *LVL XIII Brands*, 209 F. Supp. 3d at 676 (inferring the sophistication of the plaintiff's consumers "from the high price point of its sneakers").

Plaintiffs argue in conclusory fashion that this factor weighs in their favor because "[t]he target audience for CFH's costumed characters is often times unsophisticated children . . . , who are likely to believe that they are being entertained by genuine Disney/Marvel/Lucasfilm [sic] characters."[15] (Pls.' Mem. in Supp. at 16.) However, they cite *no* evidence to support that proposition, either by way of an expert opinion or consumer surveys. *Cf. Warner Bros., Inc. v. Gay Toys, Inc.*, 658 F.2d 76, 79 (2d Cir. 1981) (relying on a consumer survey which showed that eight in ten children surveyed responded immediately to the "Dixie Racer" as being the "General Lee" or "The Dukes of Hazzard Car"). Nor is there adequate independent evidence about the sophistication of Defendants' clients or the relative prices charged for Defendants' services.

This factor therefore tips in Defendants' favor, as well.

   h.   Balancing the *Polaroid* Factors

On balance, the *Polaroid* factors weigh in Defendants' favor and against a finding of likelihood of consumer confusion. Although "the *Polaroid* inquiry is not a mere mechanical counting exercise[,]" *Coty*, 277 F. Supp. 3d at 456 (internal quotation marks and citation omitted), just two factors—the strength and similarity of the marks—favor Plaintiffs. The majority of factors, however, including competitive proximity, whether Plaintiffs are likely to "bridge the gap," evidence of actual confusion, Defendants' intent in adopting the mark, the quality of Defendants' marks, and consumer sophistication all point in Defendants' direction. Based on the relevant factors, this Court concludes that no reasonable jury could find a likelihood of consumer confusion as to the origin, source, and/or

---

[15] As noted, while the target audience for CFH's costumed characters may be children, the targeted *purchasers* were, in fact, adults. Accordingly, children are not the relevant consumers for purposes of this factor. *See Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 220 (2d Cir. 1999) ("While children may be the primary ultimate consumers of [the plaintiff's product], they are generally not the purchasers.").

sponsorship of Defendants' character-for-hire services.  Summary judgment for Defendants is therefore appropriate.

Accordingly, Plaintiffs' motion for summary judgment on their federal trademark infringement claim is DENIED, while Defendants' motion for summary judgment dismissing Plaintiffs' claims under federal and New York law for trademark infringement, unfair competition, and false designation of origin is GRANTED.

## B.  Trademark Dilution

Plaintiffs' SAC asserts a claim for trademark dilution under Section 360-l of New York's General Business Law.  (SAC ¶¶ 59–64.)  Section 360-l provides protection against an "injury to business reputation or of dilution of the distinctive quality of a mark or trade name."  N.Y. Gen. Bus. Law § 360-l.  Trademark dilution claims are principally concerned with "the gradual whittling away of a [plaintiff's] distinctive [mark]," *Allied Maint. Corp. v. Allied Mech. Trades, Inc.*, 369 N.E.2d 1162, 1166 (N.Y. 1977), and the resulting "injury to the mark's selling power[.]"  *Clinique Labs., Inc. v. Dep Corp.*, 945 F. Supp. 547, 562 (S.D.N.Y. 1996).

Unlike claims for trademark infringement, no proof of "competition between the parties or . . . confusion as to the source of goods or services" is required.  N.Y. Gen. Bus. Law § 360-l.  Anti-dilution laws are instead focused on protecting *associations* "between a product or service and its corresponding quality, brand, reputation, or origin" from being diluted through the use of another's trademark.  *Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, 156 F. Supp. 3d 425, 432 (S.D.N.Y.) (emphasis added), *aff'd*, 674 F. App'x 16 (2d Cir. 2016).  To prevail on a claim for trademark dilution under Section 360-l, a plaintiff must show:

> (1) that it possesses a strong mark, one which has a distinctive quality or has acquired a secondary meaning such that the trade name has become so associated in the public's mind with the plaintiff that it identifies goods sold by that entity as distinguished from goods sold by others, and (2) a likelihood of dilution by either blurring or tarnishment.

*Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 241 (S.D.N.Y. 2012) (citation omitted).

Here, it is undisputed that Plaintiffs' trademarks are strong. (*See supra* Section III.A.3.a.) Thus, Plaintiffs' trademark dilution claim turns on whether there is a likelihood of dilution. Plaintiffs contend that Defendants' use of their marks in connection with the provision of character-for-hire services creates a likelihood of dilution by both blurring and tarnishment. (Pls.' Mem. in Supp. at 17–18.) The record evidence does not support a cause of action for trademark dilution based a theory of blurring. However, a genuine issue of fact exists with respect to whether CFH's use of Plaintiffs' marks in connection with its character-for-hire business tarnishes Plaintiffs' marks. Accordingly, summary judgment on Plaintiffs' trademark dilution claim is inappropriate.

 *1. Blurring*

"Blurring occurs where the defendant uses or modifies the plaintiff's trademark to identify the defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." *N.Y. Stock Exch.*, 293 F.3d at 558 (internal quotation marks and citation omitted). "The classic case of dilution by blurring involves an unrelated product coopting a famous name or trademark as its own" like "Dupont shoes, Buick aspirin tablets, Schlitz varnish, Kodak pianos, Bulova gowns, and so forth." *Louis Vuitton*, 156 F. Supp. 3d at 433 (internal quotation marks and citation omitted).

In determining whether a likelihood of blurring exists, courts typically consider six factors—many of which mirror the *Polaroid* factors described above—including: "(i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; and (vi) the renown of the junior mark." *Id.* at 434 (citation omitted). The factors, however, are merely guideposts; "[t]he ultimate question under New York law is whether there is a likelihood that the capacity of the senior owner's mark to serve as

a unique identifier of its source will be diminished." *Coty*, 277 F. Supp. 3d at 459 (internal quotation marks and citations omitted).

As an initial matter, Plaintiffs do not allege that Defendants coopt their marks in connection with unrelated products, like "Frozen Snow Boots" or "Avengers Chewing Gum." Rather, they claim Defendants use Plaintiffs' marks in connection with the provision of character-for-hire services in a manner that specifically evokes Plaintiffs' characters. Accordingly, Plaintiffs have not shown that their marks "will lose [their] ability to serve as a unique identifier of [their] product[s]" as a result of Defendants' conduct. *N.Y. Stock Exch.*, 293 F.3d at 558.

Moreover, the relevant factors confirm that no reasonable jury could find a likelihood of dilution by blurring based on these facts. Plaintiffs' marks clearly have renown. However, as already discussed, there is some measure of difference in the way Defendants use and present Plaintiffs' marks, and a substantial dissimilarity between the types of goods and services offered by Plaintiffs and Defendants.

In addition, as discussed, there is no evidence regarding the sophistication level of the relevant consumers, nor is there any evidence in this record of predatory intent. As in the trademark infringement context, "[p]redatory intent involves more than mere knowledge of the senior mark—it requires a showing that the junior user adopted its mark hoping to benefit commercially from association with the senior mark." *Mead Data Cent., Inc. v. Toyota Motor Sales, Inc.*, 875 F.2d 1026, 1037 (2d Cir. 1989) (Sweet, J., concurring). Here, Plaintiffs point to no evidence that Defendants adopted Plaintiffs' marks with the intent of profiting from an association with their strong marks. To the contrary, the record evinces an effort on Defendants' part to *avoid* any such association in the minds of consumers.

Finally, although there is no evidence as to Defendants' renown, it seems improbable Defendants' marks' will "become so famous that [they] will overwhelm" Plaintiffs' mark and cause

Plaintiffs' "consumers to draw the associations identified with" Defendants' marks. *Landscape Forms, Inc. v. Columbia Cascade Co.*, 117 F. Supp. 2d 360, 370 (S.D.N.Y. 2000).

Thus, on balance, the relevant factors militate against a finding of likelihood of dilution by blurring.

### 2. Tarnishment

"[D]ilution by tarnishment 'arises when the plaintiff's trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product.'" *Coty*, 277 F. Supp. 3d at 460 (quoting *Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 43 (2d Cir. 1994)). "The sine qua non of tarnishment is a finding that plaintiff's mark will suffer negative associations through defendant's use." *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 507 (2d Cir. 1996); *see also Deere & Co.*, 41 F.3d at 43 (tarnishment occurs when the "trademark's reputation and commercial value might be diminished because the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods").

Plaintiffs do not contend that Defendants present their marks in an "unwholesome or unsavory context[.]" *Coty*, 277 F. Supp. 3d at 460. Rather, Plaintiffs claim that CFH "has a reputation for shoddy services that is inimical to Plaintiffs' stellar reputation for customer care." (Pls.' Mem. in Supp. at 19.) They again point to customer complaints filed with the BBB and negative reviews of CFH's services posted on social media. (*See id.*) Yet, as explained above, the evidence in the record is inconclusive as to Defendants' reputation in the marketplace. (*See supra* Section III.A.3.f.)

If CFH's character-for-hire services are of a markedly poor quality, a jury could reasonably find that Plaintiffs' marks may suffer from the negative associations formed as a result of Defendants' conduct. *Coty*, 277 F.3d at 460 (finding tarnishment where the plaintiff presented evidence of the inferiority of the defendant's products). Accordingly, as Defendants concede, a genuine issue of

material fact exists as to whether Defendants' use of Plaintiffs' mark is likely to cause a diminution in the reputation or value of Plaintiffs' marks.   (*See* Defs.' Opp'n at 15.)

Plaintiffs' and Defendants' motions for summary judgment on Plaintiffs' trademark dilution claim are therefore DENIED.

## C.  Copyright Infringement

Plaintiffs' copyright infringement claims arise under the federal Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*   (*See* SAC ¶¶ 33–37.)  The Copyright Act provides the owner of a copyrighted work with "the exclusive right to . . . reproduce, perform publicly, display publicly, prepare derivative works of, and distribute copies of, his copyrighted work." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010) (citing 17 U.S.C. § 106).  A party who violates those exclusive rights is liable for damages. *Warren v. John Wiley & Sons, Inc.*, 952 F. Supp. 2d 610, 616 (S.D.N.Y. 2013).  To prevail on a claim for copyright infringement, the plaintiff must prove: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Muller v. Twentieth Century Fox Film Corp.*, 794 F. Supp. 2d 429, 439 (S.D.N.Y. 2011) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, (1991)), *aff'd sub nom. Muller v. Anderson*, 501 F. App'x 81 (2d Cir. 2012).

### 1.  Ownership of a Valid Copyright

It is well settled that certificates of copyright registration constitute prima facie evidence of copyright ownership. *See Fonar Corp. v. Domenick*, 105 F.3d 99, 104 (2d Cir. 1997).  Here, Plaintiffs have submitted certificates copyrighting their highly popularized fictional characters in different manifestations, including model sheets, licensing kits, drawing sheets, style guides, and motion pictures.  (*See* Decl. of Marsha L. Reed dated Oct. 11, 2017, ECF No. 76, Exs. B.1–B.2, D.1; Decl. of Carol Pinkus dated Oct. 9, 2017, ECF No. 64, Exs. B.1–B.4.)  Although not all of the certificates were initially registered in Plaintiffs' names, Plaintiffs have submitted evidence showing that they are, in

fact, the current owners of the copyrights. (*See* Decl. of Marsha Reed dated Dec. 8, 2017, ECF No. 88, A–B, C.1–C.7; Decl. of Carol Pinkus dated Dec. 8, 2017, ECF No. 89, Schedules A–F and accompanying exhibits.) Accordingly, Plaintiffs have satisfied this element of their claims for copyright infringement.

### 2. *Infringing Activity*

To prove the second element of a copyright claim, Plaintiffs must show that Defendants "actually copied [their] work, and that such copying was illegal because a 'substantial similarity' exists between the allegedly infringing work . . . and the protectable elements of the copyrighted work[.]" *Porto v. Guirgis*, 659 F. Supp. 2d 597, 608 (S.D.N.Y. 2009) (citing *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*, 71 F.3d 996, 1002 (2d Cir. 1995)). Absent proof of direct copying, a plaintiff "may establish copying circumstantially by demonstrating that the person who composed the defendant's work had access to the copyrighted material and that there are similarities between the two works that are probative of copying." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003) (internal quotation marks and citations omitted). Probative similarity turns on "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Blakeman v. The Walt Disney Co.*, 613 F. Supp. 2d 288, 304 (E.D.N.Y. 2009) (quoting *Warner Bros. Inc. v. Am. Broad. Cos., Inc.*, 654 F.2d 204, 208 (2d Cir. 1981)).

The substantial similarity inquiry is also governed by an "ordinary observer test." *Porto*, 659 F. Supp. 2d at 609. Courts assessing whether two works are substantially similar consider "whether the ordinary observer, unless he set out to detect the disparities [between the works], would be disposed to overlook them, and regard their aesthetic appeal as the same." *Folio Impressions, Inc. v. Byer Cal.*, 937 F.2d 759, 765 (2d Cir. 1991) (internal quotation marks and citation omitted). Although "*dissimilarity* between some aspects of the works will not automatically relieve the infringer of liability," *Williams v. Crichton*, 84 F.3d 581, 588 (2d Cir. 1996), "numerous differences tend to

31

undercut substantial similarity." *Am. Broad.*, 720 F.2d at 241 (citation omitted). Where "no reasonable trier of fact could find the works substantially similar, summary judgment is appropriate." *Crichton*, 84 F.3d at 587 (internal quotation marks and citation omitted).

Plaintiffs claim that CFH reproduced and publicly displayed Plaintiffs' copyrighted characters by "upload[ing] still and video images of those characters" on CFH's website and other social media sites. (Pls.' Mem. in Supp. at 22.) Plaintiffs also claim that CFH publicly performed their copyrighted characters, including the characters' "personas and story lines," by providing live costumed actors to perform as Plaintiffs' characters at themed entertainment events and by making videos and images of such performances available on its website and other social media sites. (*Id.*)

Defendants dispute that they have reproduced, copied, displayed, or performed any of Plaintiffs' copyrighted characters. (*See* Defs.' Opp'n at 7.) Defendants also dispute the accuracy of some images of CFH's website that Plaintiffs submitted in support of their motion. (See Defs.' Resp. to Pls.' 56.1 Stmt. ¶ 67; *see also* Sarelli Decl. ¶ 7.) In addition, Defendants contend that their use of characters from Norse mythology and "centuries-old fairy tales and folk tales" do not infringe on any original expression Plaintiffs have added to these "public domain characters." (Defs.' Mem. at 6.)

Based on the current record, this Court cannot conclude that Defendants have infringed Plaintiffs' copyrighted characters because Plaintiffs do not point to any admissible evidence demonstrating that Defendants have engaged in the alleged infringing conduct. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.") (internal quotation marks and citation omitted). For instance, Plaintiffs rely on various poor quality screenshots of CFH's website and other social media sites, including screenshots of older versions of the websites preserved by the Internet Archive, as well as several videos allegedly captured from CFH's website and other social media sites. (*See, e.g.*, Pls.' 56.1 ¶¶ 64–66, 68–75, 78–86, 87–96.)

The screenshots and videos, however, have not been properly authenticated and are submitted to this Court through an attorney declaration, which claims in boilerplate fashion that it is "based upon [the attorney's] personal knowledge of matters detailed [t]herein." Such evidence is not admissible and cannot be considered in deciding the instant motions for summary judgment. *Cf. United States v. Gasperini*, No. 17-2479-cr, 2018 WL 3213005, at *5 (2d Cir. July 2, 2018) (archived screenshots were admissible where the proponent "presented testimony from the office manager of the Internet Archive, who explained how the Archive captures and preserves evidence of the contents of the internet at a given time. . . .[,] compared the screenshots sought to be admitted with true and accurate copies of the same websites maintained in the Internet Archive, and testified that the screenshots were authentic and accurate copies of the Archive's records"); *Universal Church, Inc. v. Universal Life Church/ULC Monastery*, No. 14 Civ. 5213 (NRB), 2017 WL 3669625, at *3 (S.D.N.Y. Aug. 8, 2017) (archived screenshots were admissible on summary judgment motion where accompanied by affidavit from employee of the archive service); *see also Specht v. Google, Inc.*, 747 F.3d 929, 933 (7th Cir. 2014) (exclusion of archived screenshots on summary judgment motion was appropriate absent "authentication by someone with personal knowledge of reliability of the archive service from which the screenshots were retrieved"). In addition, the evidence Plaintiffs rely on as proof of the public performances of their copyrighted characters consists almost exclusively of event contracts, most of which are unsigned, and none of which are properly authenticated. (*See* Pls.' 56.1 ¶¶ 101–210.) Even if such evidence were admissible, it at most represents contracts for the provision of future services rather than proof of actual infringement of Plaintiffs' copyrights.

At any rate, issues of material fact exist with respect to whether the images and videos on CFH's website and the alleged public performances by Defendants' costumed characters are substantially similar to Plaintiffs' characters, their personas, and their "story lines." Summary judgment on Plaintiffs' claims for copyright infringement is therefore inappropriate.

Accordingly, Plaintiffs' and Defendants' motions for summary judgment on Plaintiffs' copyright infringement claim are DENIED.

**D. Willfulness**

Plaintiffs seek a determination that there is no dispute of material fact that Defendants' conduct was willful. (Pls.' Mem. at 24.) A finding of willful infringement would entitle Plaintiffs to an enhanced award of statutory damages. *See Shamir v. Anchor-Int'l Found., Inc.*, No. 10 Civ. 725 (PGG), 2013 WL 4008635, at *10 (S.D.N.Y. July 30, 2013) ("If the court finds willful infringement, . . . the award can be as high as $150,000; if the court finds that the infringement was 'innocent,' damages can be as low as $200.")

"To prove 'willfulness' under the Copyright Act, the plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of 'reckless disregard' for, or 'willful blindness' to, the copyright holder's rights." *Island Software*, 413 F.3d at 263. "[K]knowledge . . . . need not be proven directly but may be inferred from the defendant's conduct." *N.A.S. Imp., Corp. v. Chenson Enters., Inc.*, 968 F.2d 250, 252 (2d Cir. 1992). "Reckless disregard for the possibility of infringement may be found when the infringer should have known—for instance, by virtue of his occupation—that the particular acts would constitute infringement." *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 176 F. Supp. 3d 137, 164 (E.D.N.Y. 2016) (quotation marks and citation omitted).

Since summary judgment is denied with respect to Plaintiffs' claims for copyright infringement, a determination at this stage that Defendants' infringement was willful is premature. In any event, "summary judgment is not a tool well suited to determining willfulness, especially when it turns on '[d]eterminations of credibility,' which 'are within the province of the jury.'" *Close-Up Int'l, Inc. v. Berov*, 382 F. App'x 113, 117 (2d Cir. 2010) (quoting *Lipton v. Nature Co.*, 71 F.3d 464, 472 (2d Cir. 1995)). Defendant Sarelli has submitted an affidavit in which he claims that CFH made good faith

efforts to find and remove the videos and images that Plaintiffs requested it take down in their various cease-and-desist letters. (Sarelli Decl. ¶ 9.) Sarelli, who is not a lawyer, further claims that he was unrepresented when Plaintiffs contacted him and that he modified the language in CFH's event contracts and on CFH's website in a good faith attempt to resolve the dispute with Plaintiffs. (*Id.* ¶ 12.) The record evidence, including the copyright and trademark disclaimers on CFH's website and in its putative event contracts, (Pls.' 56.1 Stmt. ¶¶ 218–221; Ederer Decl., Ex. Y at DEI00009311), corroborate Sarelli's contentions and rebut Plaintiffs' claims of willful infringement. Thus, at a minimum, there are issues of material fact concerning Sarelli's state of mind, rendering summary judgment on the question of willfulness improper. *See Lipton*, 71 F.3d at 472.

## IV.    CONCLUSION

Defendants' motion for summary judgment, (ECF No. 66), dismissing Plaintiffs' claims for (i) trademark infringement, (ii) unfair competition, and (iii) false designation of origin is GRANTED. However, Defendants' motion for summary judgment dismissing Plaintiffs' claims for (i) trademark dilution, and (ii) copyright infringement is DENIED. Plaintiffs' motion for partial summary judgment on its claims of (i) trademark infringement, (ii) copyright infringement, and (iii) trademark dilution, (ECF No. 59), is similarly DENIED.

Dated: August 9, 2018
      New York, New York

SO ORDERED.

*George B. Daniels*
GEORGE B. DANIELS
United States District Judge